624 F.2d 415
 Richard L. THOMPSON
v.
Norman CARLSON, Director, United States Bureau of Prisons,
and Charles Fenton, Warden, United States
Penitentiary, Lewisburg, Pennsylvania, Appellants.
 No. 79-1651.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 12, 1979.
Decided May 22, 1980.
 
 Philip B. Heymann, Asst. Atty. Gen., Lawrence Lippe, Henry E. Davis (argued), Attys., U. S. Dept. of Justice, Washington, D. C., for appellants.
 John M. Humphrey (argued), Williamsport, Pa., for appellee.
 Before ADAMS, ROSENN and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 
 1
 Appellants Norman Carlson, Director, United States Bureau of Prisons, and Charles Fenton, Warden of the Lewisburg Penitentiary, (hereinafter "Government") appealed from the order of the district court granting a writ of habeas corpus and directing officials of the United States Bureau of Prisons to transfer appellee prisoner to an institution at which he will be segregated from adult offenders and receive the treatment for youth offenders prescribed by 18 U.S.C. § 5011. The Government asserts that a prisoner who is given a consecutive sentence of life imprisonment as an adult offender while he is serving a Federal Youth Corrections Act ("YCA") sentence need not serve the remainder of the YCA sentence at a special YCA facility but may be returned to the general prison population. Because we conclude that under the circumstances of this case the YCA should not be construed to mandate completion of the YCA sentence in a YCA facility, we will reverse the order of the district court.
 
 II.
 Facts
 
 2
 Appellee Richard Thompson was convicted in federal court in 1974 for assault with intent to rape on a federal reservation. Thompson was seventeen years old when convicted. He received an eight year sentence pursuant to section 5010(c) of the Youth Corrections Act, 18 U.S.C. § 5010(c), and was initially committed to the Federal Correctional Institution at Ashland, Kentucky. On June 27, 1977, while he was incarcerated in the Federal Correctional Institution in Lompoc, California, Thompson was convicted of first degree murder as a result of his participation in the murder of a fellow inmate who was stabbed by several other inmates while Thompson guarded against intrusion. Thompson, who was twenty years old at the time, was sentenced in the United States District Court for the Central District of California to a consecutive adult term of life imprisonment. The sentencing judge made a specific finding that Thompson would "not derive benefit under 18 U.S.C. § 5010(b) or (c) of the Federal Youth Corrections Act as a Youth Offender." Thereafter in July, 1977, Thompson was transferred to the United States Penitentiary in Lewisburg, Pennsylvania where he was held without segregation from adult prisoners.
 
 
 3
 Thompson's record manifests a history of assaults and other offenses committed while he was serving his YCA sentence. In January, 1975, while at the Federal Correctional Institution, Milan, Michigan, he assaulted another inmate. He received incident reports while at Milan for, inter alia, threatening a staff member with bodily harm, assault, and disruptive conduct. In April, 1975, Thompson was transferred to the Federal Correctional Institution, El Reno, Oklahoma, "for adjustment purposes" but there received additional incident reports, including one for making a sharpened weapon. In September, 1975, while being transferred to the Federal Correctional Institution, Lompoc, California, Thompson was involved in a fight with another person. His participation in the murder of the fellow Lompoc inmate occurred in February, 1976. In May, 1977, Thompson was sentenced to a concurrent jail term of one year by a California state court for assaulting a Los Angeles County corrections officer while being processed into the Los Angeles County Jail. The officer suffered a fractured nose and concussion. Even after his transfer to Lewisburg, Thompson has received incident reports for his actions including the assault of a staff member, threatening another staff member with bodily harm, and inciting other inmates to riot.
 
 
 4
 While at Lewisburg, Thompson filed a petition for habeas corpus alleging that his confinement there was illegal because he was entitled to be segregated from adult offenders until the completion of his YCA sentence in June, 1981, when the consecutive life sentence will begin. His petition was referred to a United States Magistrate. The magistrate's report, issued on January 19, 1979, contains the following:
 
 
 5
 The magistrate feels that there is merit to the Government's argument that little purpose would now be served in confining petitioner in a youth institution, particularly when in the not too distant future he will be committed to a regular adult facility to serve his life sentence. The magistrate also believes that there is merit to the Government's argument that petitioner, with the type of behavior that he has exhibited which resulted in both his YCA sentence and his consecutive life sentence, together with his sorry history of behavior while incarcerated, would not benefit from youth confinement and, indeed, petitioner could well be a disruptive influence on those who have been receptive to YCA treatment. (emphasis in original).
 
 
 6
 Nonetheless, the magistrate held that Thompson was entitled to be segregated from adult inmates because of this court's interpretation of the YCA in United States ex rel. Dancy v. Arnold, 572 F.2d 107 (3d Cir. 1978), and the subsequent district court opinion in Micklus v. Carlson, No. 77-1070 (M.D.Pa. Mar. 14, 1978), appeal dismissed as moot, 591 F.2d 1336 (3d Cir. 1979).
 
 
 7
 The district court adopted the recommendations of the magistrate. It also interpreted the Dancy decision as mandating that an individual sentenced to consecutive youth and adult terms be incarcerated in a YCA facility during service of the YCA sentence. It held that Thompson's difficulties as a prisoner could be handled by the provision of the YCA permitting segregation of classes of committed youth offenders. 18 U.S.C. § 5011. Therefore, the district court granted the petition for a writ of habeas corpus.
 
 
 8
 On appeal, the Government argues that because there has been an intervening judicial determination that the prisoner would not derive benefit from YCA treatment during the service of his consecutive sentence, the YCA should be construed to allow the Bureau of Prisons to exercise its discretion in selecting an institution for the confinement of the prisoner during the remainder of his YCA sentence.
 
 III.
 The Federal Youth Corrections Act
 
 9
 The YCA has been described by the Supreme Court as "the most comprehensive federal statute concerned with sentencing." Dorzynski v. United States, 418 U.S. 424, 432, 94 S.Ct. 3042, 3047, 41 L.Ed.2d 855 (1974). Its provisions are designed to "make available for the discretionary use of the Federal judges a system for the sentencing and treatment of persons under the age of 22 years . . . that will promote the rehabilitation of those who . . . show promise of becoming useful citizens, and so will avoid the degenerative and needless transformation of many of these young persons into habitual criminals." H.R.Rep.No. 2979, 81st Cong., 2d Sess. 1 (1950), reprinted in (1950) U.S.Code Cong. Service p. 3983 (hereinafter "H.R.Rep.No. 2979").
 
 
 10
 Under the statute, a judge sentencing a youth offender, defined as "a person under the age of twenty-two years at the time of conviction," 18 U.S.C. § 5006(d), must determine whether the youth offender will derive benefit from treatment under the YCA. 18 U.S.C. § 5010(d).[1] In Dorzynski v. United States, supra, the Court held that the statute requires an explicit finding of "no benefit" as a condition precedent to sentencing an eligible offender as an adult, but also held that the sentencing judge need not accompany such a finding by supporting reasons. When the sentencing court does find that the youth offender could derive benefit from the YCA, the Act provides the sentencing court with options additional to those ordinarily available. 418 U.S. at 441-42, 94 S.Ct. at 3051-52. In the Dorzynski case, the Supreme Court reviewed in detail the history of the Act and described the options of treatment and probation made available to the federal sentencing court under the Act.
 
 
 11
 It noted that the purpose of the Act was "to provide a better method for treating young offenders convicted in federal courts in (the) vulnerable age bracket (between 16 and 22 years of age), to rehabilitate them and restore normal behavior patterns." 418 U.S. at 433, 94 S.Ct. at 3048.
 
 
 12
 To accomplish this objective, federal district judges were given two new alternatives to add to the array of sentencing options previously available to them . . . first, they were enabled to commit an eligible offender to the custody of the Attorney General for treatment under the Act. 18 U.S.C. § 5010(b) and (c). Second, if they believed an offender did not need commitment, they were authorized to place him on probation under the Act. 18 U.S.C. § 5010(a). If the sentencing court chose the first alternative, the youth offender would be committed to the program of treatment created by the Act.
 
 Id.[2]
 
 13
 If a youth offender has been sentenced to institutional treatment, the statute gives the Parole Commission (formerly the Parole Board) power to order conditional release at any time under supervision of federal probation officers. 18 U.S.C. §§ 5006, 5017, 5019. The Commission also has the discretion to order the unconditional discharge of committed persons before the time that their unconditional discharge is mandated by the statute. 18 U.S.C. § 5017(b). When such early discharge is effected, the conviction upon which the sentence rests is automatically set aside. 18 U.S.C. § 5021(a).[3] Similarly, youth offenders who receive an unconditional discharge from a sentence of probation prior to the expiration of their maximum sentence will have their convictions set aside. 18 U.S.C. § 5021(b).[4]
 
 
 14
 The statutory section which describes the institutional treatment to which YCA offenders can be committed provides:
 
 
 15
 Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment. The Director shall from time to time designate, set aside, and adapt institutions and agencies under the control of the Department of Justice for treatment. Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment.
 
 
 16
 18 U.S.C. § 5011.
 
 
 17
 In United States ex rel. Dancy v. Arnold, 572 F.2d 107 (3d Cir. 1978), we construed that section to require that youth offenders sentenced under the YCA must be segregated from adult prisoners. We rejected the Government's argument that the phrase "(i)nsofar as practical" required segregation of youth offenders from adult prisoners only insofar as segregation is practical. Instead we held that language referred only to the provision that institutions for the treatment of youth offenders should be used solely for that purpose. Although we recognized that the language of the statute is capable of more than one interpretation, id. at 110, we interpreted congressional intent to be "that the segregation of committed youth offenders from adult offenders was to be mandatory." Id. at 113.
 
 
 18
 The Government contends that Dancy is inapplicable to this case because Thompson has been convicted of first degree murder and sentenced to a regular adult term, even though he was eligible for sentencing under the Youth Corrections Act, and because the sentencing court determined that he would not benefit from the treatment under the Act in serving the adult sentence. The district court rejected the Government's distinction, and decided "that the holding of Dancy that Youth offenders cannot consistent with the Act's rehabilitative purposes, be placed in contact with adult offenders is applicable to this action."
 
 IV.
 Discussion
 
 19
 All of the parties agree that this is a case of first impression.[5] It is also apparent that the issue presented by this factual situation was not in the contemplation of Congress when it enacted the YCA, and that, however we rule, we will be required to fill in the interstices of the statute. Although we believe the issue is not free from doubt, we hold that under the facts of this case, the Bureau of Prisons was not required to continue to hold Thompson under the conditions prescribed by the YCA for the remainder of his YCA sentence.
 
 
 20
 1. The overriding purpose of the YCA is directed to the rehabilitation of the youth offender. The Congressional history indicates that the statute was designed to provide treatment during commitment for youth offenders in preparation for their eventual release following the YCA commitment. The statute was designed for those persons who "show promise of becoming useful citizens." H.R.Rep.No. 2979 at 1, reprinted in (1950) U.S.Code Cong. Service at 3983. Congress was concerned because "(a) large percentage of those released from our reformatories and penal institutions return to antisocial conduct and ultimately become hardened criminals." Id. at 2, reprinted in (1950) U.S.Code Cong. Service at 3985 (emphasis added). The House Report stated:
 
 
 21
 Most of the causes which contribute to antisocial conduct of youth offenders in the period between adolescence and maturity disappear when the youth reaches full maturity. The problem is to provide a successful method and means for treatment of young men between the ages of 16 and 22 who stand convicted in our Federal courts and are not fit subjects for supervised probation a method and means that will effect rehabilitation and restore normality, rather than develop recidivists.
 
 
 22
 Id. at 3, reprinted in (1950) U.S.Code Cong. Service, at 3985 (emphasis added). Neither the Congressional history nor the statute made any provision for the possibility that the treatment provided would be so unsuccessful that the committed YCA offender might commit a serious crime during a YCA sentence and thereby be required to serve a subsequent adult sentence.
 
 
 23
 2. The interpretation of the YCA given in the Dancy decision was predicated on a fact pattern in which there was the expectation that the youth offender would be released from commitment following completion of the YCA prescribed course of treatment. This court construed the statute to require segregation of youth offenders from the adult prisoner population in contemplation of the subsequent release of such youth offenders. We noted "the Act was designed to spare youth offenders the corruptive influence of prison life and association with adult criminals . . . ." 572 F.2d at 112 (emphasis added). Patently, a prisoner who is destined to serve a subsequent prolonged adult sentence will not be spared association with adult criminals.
 
 
 24
 3. The decision whether to invoke the provisions of the YCA is exclusively judicial. It is the sentencing court which must make a judgment as to whether a youth offender will derive benefit from treatment under the YCA. If the court desires additional information, it can order a study from the appropriate classification center or agency, 18 U.S.C. § 5010(e), which considers, inter alia, the offender's personal traits, capabilities, school circumstances, family life, previous delinquency or criminal experience, and any mental or physical defect or other factor contributing to delinquency. 18 U.S.C. § 5014. Presumably, these are also the type of factors considered by the sentencing court in determining whether the youth offender can benefit from YCA treatment.[6] Although the Bureau of Prisons is given considerable discretion under the Act, that discretion involves decisions such as whether to assign the youth offender to treatment in an institution or an agency, selection of the facility to which the offender will be committed, transfer of the offender from one institution or agency, and the conditions under which the committed youth offender should be confined or treated "best designed for the protection of the public." 18 U.S.C. § 5015. There is no language in the act authorizing the court to delegate to the Bureau of Prisons the discretion to make the determination required under 18 U.S.C. § 5010(d) as to whether a youth offender will derive benefit from YCA treatment.
 
 
 25
 4. In this case, the Government asks us to construe the statute "so as to permit the Bureau of Prisons to exercise its informed judgment as to the institution and conditions of confinement best suited for prisoners serving YCA sentences who also have regular adult sentences yet to be served." If we were to so construe the statute, we would expand considerably the power given to the Bureau of Prisons by vesting in it that which Congress has given exclusively to the judiciary, i. e., the determination whether the offender can benefit under the YCA. We find no statutory basis or policy reason for such a construction. Despite the control given the Bureau of Prisons over many aspects of the commitment of the youth offender, Congress has not given it either the power to invoke or the power to revoke the application of the statute to a committed youth offender. Even in the case of prisoners who have manifested serious adjustment difficulties after commitment, the Bureau of Prisons is limited to designation of an appropriate institution or, as we noted in Dancy, segregation of committed youth offenders according to their needs for treatment. 572 F.2d at 113 n.10.
 
 
 26
 5. There is only one circumstance in which the subsequent behavior of a committed youth offender can bring before the court the issue whether there is any benefit to the youth offender of continued treatment under the YCA. That arises when the youth offender, while still serving part of a YCA sentence, commits and is convicted of another crime. At the time of the second sentencing, that judge must repeat the process of determining whether the prisoner can benefit from the YCA. That judgment must then be made in light of the additional information available about the offender's adaptation to the YCA commitment and the commission of the subsequent offense.
 
 
 27
 The second sentencing judge has the choice to impose a YCA sentence, an adult sentence to run concurrently, or an adult sentence to run consecutively. Although the Ninth Circuit has held that it would be inconsistent to impose simultaneously a YCA sentence and a consecutive adult sentence, United States v. Ortiz, 513 F.2d 198, 199 (9th Cir.), cert. denied, 423 U.S. 843, 96 S.Ct. 78, 46 L.Ed.2d 64 (1975), see also Burks v. United States, 496 F.2d 24, 25 (6th Cir. 1974), the Tenth Circuit has held that a subsequently imposed adult sentence on a YCA offender does not create a statutory or constitutional conflict. Roddy v. United States, 509 F.2d 1145 (10th Cir. 1975); Nast v. United States, 415 F.2d 338 (10th Cir. 1969).[7] The court recognized that "the rehabilitative potential afforded by commitment to a youth corrections center might be lessened by a subsequently imposed consecutive sentence," id. at 340, but noted that the second sentencing court was not required to give effect to the previously imposed indeterminate youth sentence. Roddy v. United States, supra at 1147. Those cases preceded the Dancy decision and therefore the opinions did not discuss the effect of the imposition of the second sentence on the terms and conditions of commitment under the original YCA sentence. However, the YCA statute itself expressly recognizes that there can be judicial reevaluation during the service of a YCA sentence. It provides that nothing in the Act "shall limit or affect the power of any court to suspend the imposition or execution of any sentence and place a youth offender on probation", 18 U.S.C. § 5023. Also, the statute was amended in 1961 to extend the benefit of a certificate setting aside the conviction to offenders sentenced to probation under § 5010(a) when the court unconditionally discharges the offender prior to expiration of the sentence of probation imposed. See Durst v. United States, 434 U.S. 542, 548, 98 S.Ct. 849, 852, 55 L.Ed.2d 14 (1978). Thus, it would not be inconsistent with the statutory scheme to hold that a judicial reevaluation of the continued benefit of commitment as a YCA offender is permissible when such a reevaluation is triggered by the offender's own commission of a crime.
 
 
 28
 That, of course, is the fact situation sub judice. Here, after having made a specific finding that Thompson could not benefit from YCA treatment, the second sentencing judge imposed an adult sentence to run consecutive to the YCA sentence. Imposition of a consecutive sentence is traditionally imposed as a more severe punishment than a concurrent sentence.[8] We conclude that the judicial determination that Thompson could not benefit from the YCA, and must therefore serve the second sentence as an adult prisoner, was a finding that continued service of the original sentence under YCA conditions is no longer beneficial. Because that represented a judicial reevaluation in light of currently available information, we hold that Thompson can be returned to an adult prisoner population for the remainder of the YCA sentence.[9]
 
 
 29
 6. We recognize that a result of this holding is to permit the transfer of Thompson to commitment under conditions of confinement which he finds substantially less favorable than those under which he was previously committed. Since that transfer followed a judicial determination made after a full due process trial which was precipitated by the offender's commission of the crime. We do not confront the issue which faced the Court in Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).
 
 
 30
 7. A contrary construction of the YCA, which would mandate that Thompson complete the service of his original sentence under YCA terms until its conclusion, would lead to a futile result. As noted infra, all youth offenders who are committed under the YCA and who are not unconditionally discharged before such a discharge is mandated must be conditionally discharged for at least 2 years before the end of their sentence. See 18 U.S.C. § 5017(b) and (c). That would be patently impossible in Thompson's case because the imposition of the life sentence means that Thompson will not be eligible for release until he has served ten years of that life sentence. 18 U.S.C. § 4205(a). This provides further indication that the concern of the statute is toward those prisoners who will be released following the YCA sentence. Therefore, the purpose of the YCA treatment under segregation is inapplicable to him.
 
 
 31
 For these reasons, we will reverse the order of the district court and remand with instructions that the court deny the writ of habeas corpus.
 
 
 32
 ADAMS, Circuit Judge, dissenting.
 
 
 33
 The Federal Youth Corrections Act (YCA) sets forth certain mandatory conditions of confinement and treatment for youth offenders sentenced pursuant to the Act. In particular, youth offenders serving a YCA sentence "(are) at all times to be confined away from the corruptive influence of adult criminals," United States ex rel. Dancy v. Arnold, 572 F.2d 107, 113 (1978). Nevertheless, the majority decides on this appeal that the Bureau of Prisons is not bound to comply with the Act's mandate in the case of a youth offender who receives a consecutive adult sentence while serving his YCA sentence. Because I perceive no justification for this judicially-fashioned amendment to the Act, and because I believe that the result reached by the majority is contrary to both the purpose of the Act and traditional sentencing doctrine, I respectfully dissent.
 
 I.
 
 34
 In 1974, Richard Thompson, at the age of seventeen, was convicted in federal court of assault with intent to rape on a federal reservation. The trial judge imposed on Thompson an eight year sentence pursuant to § 5010(c) of the Federal Youth Corrections Act (YCA), 18 U.S.C. § 5010(c). § 5011 of the Act, 18 U.S.C. § 5011, expressly provides that committed youth offenders "shall undergo treatment in (secure) institutions . . . (which) shall be used only for treatment of committed youth offenders." For reasons that are unclear, however, Thompson was not confined in such an institution nor did he receive the type of treatment prescribed by the Act. Three years later, in 1977, while incarcerated in the Federal Correctional Institution at Lompoc, California, he was convicted in federal court of first degree murder and sentenced as an adult to serve a term of life imprisonment upon completion of his YCA sentence. Thompson was immediately transferred to the United States Penitentiary at Lewisburg, Pennsylvania, where he was incarcerated in the general adult prisoner population.
 
 
 35
 Thompson thereupon filed a petition for a writ of habeas corpus. In it, he alleged that he was entitled to youth offender treatment until the completion of his YCA sentence, at which time his consecutive adult sentence would begin, and, therefore, that his imprisonment in the general adult population at Lewisburg was illegal. Adopting the report of a United States Magistrate, the United States District Court for the Middle District of Pennsylvania granted Thompson's petition and ordered him transferred to an institution where he would receive the kind of treatment prescribed by the Act, for the duration of his YCA sentence. Appellants, Norman Carlson, Director, United States Bureau of Prisons, and Charles Fenton, Warden, United States Penitentiary, Lewisburg, Pennsylvania, appealed from the order of the district court. The majority now reverses that order and holds that the Bureau of Prisons may confine Thompson in an adult prisoner population for the duration of his YCA sentence.
 
 II.
 
 36
 The YCA was specially designed to improve the treatment of youths convicted in federal courts between the vulnerable ages of 16 and 22, a time "when special factors operate( ) to produce habitual criminals." Dorszynski v. United States, 418 U.S. 424, 433, 94 S.Ct. 3042, 3048, 41 L.Ed.2d 855 (1974). The ultimate goal of the Act, according to the Supreme Court, is the rehabilitation of youth offenders. Id. To this end, the Act provides the sentencing judge with "a wide variety of sentencing options to ensure that youth offenders receive treatment commensurate with their individual needs for correction and rehabilitation and society's need for protection from anti-social youths." United States ex rel. Dancy v. Arnold, 572 F.2d at 110 (1978).
 
 
 37
 If the sentencing judge is of the opinion that commitment is unnecessary, he may place the youth offender on probation, 18 U.S.C. § 5010(a). Alternatively, the court may, in lieu of the penalty otherwise provided by law, sentence a youth offender to the custody of the Attorney General for treatment and supervision for not more than four years, with an additional period of probation, or until discharged by the United States Parole Commission, 18 U.S.C. §§ 5010(b), 5017(c). If the court finds that the youth offender may not be able to derive maximum benefit from such treatment within this time, it may sentence the offender for any further period authorized by law for the offense in question, or until discharged by the Commission, 18 U.S.C. §§ 5010(c), 5017(c). "The decision whether a youth convicted of a crime should be accorded YCA treatment or sentenced as an adult," as we observed in United States ex rel. Dancy v. Arnold, 572 F.2d at 110 (1978), "is placed ultimately in the hands of the sentencing judge." If the sentencing judge expressly finds that the youth offender will not derive benefit from the treatment contemplated by the YCA, he then may sentence the offender under any other applicable penalty provision.
 
 
 38
 An important feature of the regime established by the Act is that once a youth offender is committed for treatment, execution of sentence is to fit the person, not the crime for which the offender is convicted. Dorszynski, 418 U.S. at 434, 94 S.Ct. at 3048. As a result, youth offenders may in some circumstances be sentenced under the YCA to a longer term of confinement than could an adult convicted of the same offense. We have joined other courts of appeals in upholding the constitutionality of permitting youths to receive YCA sentences that are longer than those to which adults would be subject, however, on the ground that a sentence to the custody of the Attorney General for YCA supervision and treatment is essentially and significantly different from an ordinary prison sentence. See Brisco v. United States, 368 F.2d 214, 215 (3d Cir. 1966); Rogers v. United States, 326 F.2d 56 (10th Cir. 1963); Cunningham v. United States, 256 F.2d 467, 472 (5th Cir. 1958). As we declared in Dancy, "the basic theory of the Act is rehabilitation and in a sense this rehabilitation may be regarded as comprising the quid pro quo for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison." 572 F.2d at 111 (quoting Carter v. United States, 306 F.2d 283, 285 (opinion of Burger, J.) (D.C.Cir.1962).
 
 III.
 
 39
 The only sentence presently being served by Richard Thompson was imposed pursuant to the YCA. Section 5011 of that statute clearly provides that youth offenders sentenced and confined pursuant to the Act "shall be segregated from other offenders" in "institutions . . . that will provide the essential varieties of treatment" contemplated by the Act, 18 U.S.C. § 5011. See United States ex rel. Dancy v. Arnold, 572 F.2d at 107. The Supreme Court has recently reiterated that "(t)he starting point in every case involving the construction of a statute is the language itself," International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 726, 95 S.Ct. 1917, 1920, 44 L.Ed.2d 539 (1975) (Powell, J. concurring)). And, as the majority recognizes, nothing in either the YCA's provisions or its legislative history suggests that the imposition of a consecutive sentence could supply the predicate for modifying the terms of an offender's prior commitment under the Act.[1] Moreover, again as the majority itself points out, the Supreme Court has described the YCA as "the most comprehensive federal statute concerned with sentencing," Dorszynski, 418 U.S. at 432, 94 S.Ct. at 3047.
 
 
 40
 Despite all this, the majority declines to affirm the order directing that Thompson be confined apart from adult prisoners, in accordance with the treatment prescribed under the Act, for the duration of his YCA sentence. Contending that "the issue presented by this factual situation was not in the contemplation of Congress when it enacted the YCA," the majority professes not to be bound by the plain directive of § 5011. Then, having elected to "fill in the interstices" that it perceives to exist in this most comprehensive statute, the majority concludes instead that the Bureau of Prisons is not required to confine youth offenders in accordance with the terms of their YCA sentences once they have received a regular adult sentence that is to be served consecutively. In support of this decision, the majority advances what appear to be two separate arguments.
 
 A.
 
 41
 The more extensive of these arguments contains three essential steps. First, the majority asserts that "it would not be inconsistent with the statutory scheme to hold that a judicial reevaluation of the continued benefit of commitment as a YCA offender is permissible when such a re-evaluation is triggered by the offender's own commission of a crime." Next, it assumes that the second sentencing judge's finding that Thompson would not benefit from YCA treatment also constituted a judicial determination that Thompson would derive no benefit from continued service of his original YCA sentence under the prescribed conditions of treatment. Then, on the basis of this purported "judicial reevaluation in light of currently available information" by the second sentencing judge, the majority concludes that the Bureau of Prisons can return Thompson to an adult prison for the remainder of his YCA sentence.
 
 
 42
 As I see it, this line of reasoning contains a number of serious flaws. To begin with, there is nothing in the record to support the suggestion that the second sentencing judge's determination that Thompson would not benefit from YCA treatment was also a finding that continued service of the original sentence under the YCA conditions is no longer beneficial. On the contrary, the second sentencing judge made no reference whatsoever to the fact that Thompson was, at the time of sentencing, serving a separate and previously imposed YCA sentence.[2] And although it is reasonable to assume that the second sentencing judge was aware that Thompson was then serving a YCA sentence, it also is likely that the judge's attention was focused on the question whether, upon completion of this YCA sentence, Thompson would derive benefit from further YCA treatment. This is so, since this was the precise question before the second judge.
 
 
 43
 Even if it is assumed arguendo that the second sentencing judge did make a finding regarding the continued benefit to Thompson of YCA treatment during his initial sentence, however, there is absolutely no statutory basis for permitting a second sentencing judge to reevaluate the continued benefit to a youth offender of treatment under a YCA sentence imposed previously by a different trial judge for an entirely separate offense. The majority argues in support of this conclusion that "the YCA statute itself expressly recognized that there can be judicial reevaluation during the service of a YCA sentence." To buttress this assertion, the majority relies on the statutory provision that "(n)othing in this chapter shall limit or affect the power of any court to suspend the imposition or execution of any sentence . . . ," 18 U.S.C. § 5023. But this provision simply makes clear that the YCA was not meant to limit or affect any already existing power of a court regarding suspended sentences and probation. There is not a word in the legislation about augmenting sentences or about having a second judge in any way change them. Indeed, the majority's construction of the Act is devoid of support in either the statutory provisions or the legislative history. As a result, the only justification the majority can muster for the type of judicial reevaluation it condones is that the YCA does not specifically prohibit such a scheme. I think it may fairly be presumed, however, that if Congress in enacting "the most comprehensive federal statute concerned with sentencing" had intended this sort of reconsideration of YCA sentences, it would have said so.[3]
 
 
 44
 Not only is the majority's construction unsupported by any language in the statute, it is also at variance with traditional sentencing doctrine, clear congressional intent, and the opinion of the Supreme Court in Dorszynski. As the Court specifically determined, "(t)he intent of Congress (in enacting the YCA) was in accord with long-established authority in the United States vesting the sentencing function exclusively in the trial court," 418 U.S. at 440, 94 S.Ct. at 3051. Noting that, because the Act was the product of studies made by a committee of federal judges, the views of the Act's sponsors were "of particular importance" with regard to the Act's effect on the sentencing discretion of trial judges, the Court concluded that "they uniformly support the view that the Act was intended to preserve the unfettered sentencing discretion of federal district judges," 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855. Accordingly, the Supreme Court held "that the discretion vested in a district judge under (the Act) is essentially the same as the traditional discretion vested in the (sentencing) court," 418 U.S. at 442, 94 S.Ct. at 3052.
 
 
 45
 The Supreme Court then pointed out that it is a firmly settled rule of federal criminal practice that no other judicial body may review or exercise control over a sentence imposed by a trial court, so long as that sentence is within the limits allowed by statute and the Constitution, 418 U.S. at 440-41, 94 S.Ct. at 3051.[4] A sentencing judge's exercise of discretion, absent an abuse, is not subject to challenge. And, quite clearly in the view of the Supreme Court at least, "the Act was meant to enlarge, not restrict, the sentencing options of federal trial courts in order to . . . 'promote the rehabilitation of (youth offenders) who in the opinion of the sentencing judge, show promise of becoming useful citizens . . .,' " 418 U.S. at 436, 94 S.Ct. at 3049, (quoting in part, with emphasis added) H.R.Rep.No. 2979, Cong.Sess. 1. The conclusion that the imposition of an adult sentence by one judge would preclude YCA treatment under the sentence of another, however, as the District of Columbia Court of Appeals has recently declared, is "clearly inconsistent with the purpose of the Act 'to add to the array of sentencing options previously available' to sentencing judges," Johnson v. United States, 391 A.2d 1383, 1384 (1978) (quoting in part Dorszynski, 418 U.S. at 433, 94 S.Ct. at 3048). Indeed, the majority's approach effectively denies what that court called "an essential prerequisite" to the sentencing judge's determination whether a defendant will benefit from YCA treatment: namely, "that each sentencing judge exercise his own discretion, a discretion which cannot be delegated," 391 A.2d 1383, 1384 (1978).[5] Like the Supreme Court, but unlike the majority, I do not believe we should "assume Congress to have intended such a departure from well-established doctrine without a clear expression to disavow it," Dorszynski, 418 U.S. at 441, 94 S.Ct. at 3052.
 
 
 46
 Of additional concern, the majority's construction of the YCA raises serious constitutional questions.[6] As already indicated, constitutional challenges to the practice of permitting youth offenders to be confined under the YCA for longer periods than they would otherwise be subject to have been rejected repeatedly because "such confinement cannot be equated with incarceration in an ordinary prison," Carter v. United States, 306 F.2d at 285. But under the majority's interpretation, youth offenders in some cases possibly will be subject to incarceration in an ordinary prison for longer periods than those to which adult offenders convicted of the same offense would be subject. Equally serious, although the question has not been raised by the appellee, the majority's decision appears to pose an issue of double jeopardy. For its effect is to permit a second judge one who happens to be imposing a subsequent sentence on the offender for an entirely separate offense to substitute a different and more severe sentence for the prior sentence imposed by the youth offender's first trial judge.
 
 B.
 
 47
 The second principal argument advanced by the majority in support of its decision is less elaborate. Essentially, the majority asserts that Thompson's completion of his original YCA sentence under the conditions prescribed by the YCA "would lead to a futile result." Inasmuch as a youth offender "destined to serve a subsequent adult sentence will not be spared association with adult criminals," the majority reasons, no useful purpose would be served by the continued segregation of such an offender from the general prison population. As a result, the majority concludes that once a youth offender serving a YCA sentence receives an adult sentence to be served consecutively, the Bureau of Prisons can confine him within the general population of a federal penitentiary for the duration of his YCA sentence.
 
 
 48
 It is of course true, as the Court of Appeals for the Tenth Circuit has recognized in rejecting an argument similar to the majority's, that "the rehabilitative potential afforded by commitment to a youth corrections center might be lessened by a subsequently imposed consecutive sentence," Nast v. United States, 415 F.2d 338, 340 (10th Cir. 1969). On the other hand, it may be that a youth who goes through a period of treatment in a youth correction center would be less susceptible to the influences of hardened criminals during his subsequent confinement than one not so treated. This might be so if one accepts the motivating assumption, which was central to the enactment of the statute, that an offender is more susceptible to corrective treatment and rehabilitation as a "youth" than in later years, Dorszynski, 418 U.S. at 432-33, 94 S.Ct. at 3047-48.
 
 
 49
 In any event, "(T)hese are peculiarly questions of legislative policy." Dorszynski, 418 U.S. at 442, 94 S.Ct. at 3052 (quoting Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405 (1958)). Accordingly, whatever the relative merits of such arguments, I agree with the Tenth Circuit that "the problem raised by appellant is for such legislative consideration as it might enlist, rather than one to be solved as appellant presses upon this court," Nast v. United States, 415 F.2d at 340. If, as the majority believes, the statute as drafted is thought inadequate or unwise, "the remedy," to quote the Supreme Court, "must be afforded by act of Congress, not by judicial legislation under the guise of construction," Dorszynski, 418 U.S. at 442, 94 S.Ct. at 3052 (quoting Blockburger v. United States, 284 U.S. 299, 305, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)).
 
 IV.
 
 50
 In sum, I am unpersuaded that the arguments advanced by the majority justify the conclusion that the Bureau of Prisons is not bound to comply with the YCA's mandate in the case of a youth offender who receives a consecutive adult sentence while serving his YCA sentence. In the absence of any indication to the contrary, in either the statutory language or the legislative history, I would affirm the judgment of the district court ordering that Thompson be treated in accordance with YCA for the duration of his sentence under that Act.
 
 
 
 [1]
 A YCA sentence may be given to a defendant who is over twenty-two and not yet twenty-six years of age at the time of conviction, if the sentencing court affirmatively "finds that there are reasonable grounds to believe that the defendant will benefit from the treatment provided under the Federal Youth Corrections Act." 18 U.S.C. § 4216
 
 
 [2]
 If a youth offender is sentenced to probation under section 5010(a) the court may impose a fine as a condition of probation. Durst v. United States, 434 U.S. 542, 553, 98 S.Ct. 849, 855, 55 L.Ed.2d 14 (1978). If a youth offender is sentenced under section 5010(b) for an indefinite sentence, s/he may be released under supervision at any time, must be released under supervision within 4 years from the date of conviction, and must be unconditionally discharged within 6 years from the date of conviction. 18 U.S.C. § 5017(a) and (c). If the youth offender is sentenced under section 5010(c), s/he may be sentenced for a time longer than 6 years, but for no longer than authorized by law for the particular offense for which s/he is convicted. Youth offenders sentenced under that section may be released under supervision at any time, must be released under supervision not later than 2 years before expiration of the term imposed by the court, and must be unconditionally discharged on or before expiration of the maximum term imposed. See 18 U.S.C. § 5017(a) and (d)
 Although sentences under section 5010(b) may cause some youth offenders to spend more time in YCA commitment than they could have been sentenced to under traditional adult sentencing, the constitutionality of section 5010(b) has been upheld on the theory that "rehabilitation may be regarded as comprising the quid pro quo for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison." Carter v. United States, 306 F.2d 283, 285 (D.C.Cir.1962) (Warren E. Burger, Cir. J.). See also Caldwell v. United States, 435 F.2d 1079, 1081 (10th Cir. 1970); Brisco v. United States, 368 F.2d 214, 215 (3d Cir. 1966).
 
 
 [3]
 There is a conflict as to whether the "setting aside" of the conviction has the effect of expunging it. Compare United States v. McMains, 540 F.2d 387 (8th Cir. 1976) and United States v. Doe, 556 F.2d 391 (6th Cir. 1977) with Doe v. Webster, 606 F.2d 1226 (D.C.Cir.1979)
 
 
 [4]
 Schaefer, The Federal Youth Corrections Act: The Purposes and Uses of Vacating The Conviction, 39 Fed.Probation 31-38 (Sept.1975)
 
 
 [5]
 The district court noted that this issue was raised in another case arising in the same district. In that case, which is the subject of an unreported opinion, Micklus v. Carlson, et al., No. 77-1070 (M.D.Pa. Mar. 14, 1978), appeal dismissed as moot, 591 F.2d 1336 (3d Cir. 1979), the prisoner was sentenced to five years' imprisonment as an adult for escaping while serving a YCA sentence, the escape sentence to be served consecutive to the YCA sentence. There was no discussion in the district court opinion in the Micklus case of the issue directly before us, the effect of a subsequent adult sentence on the manner in which the YCA sentence must be completed
 
 
 [6]
 The majority opinion in Dorzynski v. United States, 418 U.S. at 443, 94 S.Ct. at 3052 held that the sentencing judge need only have "considered the option of treatment under the Act and rejected it." 418 U.S. at 443, 94 S.Ct. at 3053. The four Justices who concurred in the judgment would have required the trial judge to include a statement "which makes clear that he considered the provisions of the Act, weighed the treatment option available, and decided in light of his familiarity with the offender that he would not derive benefit from treatment under the Act" Id. at 453, 94 S.Ct. at 3057
 
 
 [7]
 See also In re Grand Jury Proceedings, 532 F.2d 410 (5th Cir.) (per curiam), cert. denied, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976), where the court affirmed a civil contempt citation which suspended the running of the YCA sentence
 
 
 [8]
 See Schultz v. United States, 384 F.2d 374, 375 (5th Cir. 1967); see also Borum v. United States, 409 F.2d 433, 440 (D.C.Cir.1967), cert. denied, 395 U.S. 916, 89 S.Ct. 1765, 23 L.Ed.2d 230 (1969) (It is a violation of the constitutional prohibition against defendants being twice punished for the same offense for the sentencing court to clarify its silence as to the type of sentences it imposed by determining they are consecutive); A. Campbell, Law of Sentencing 249-50 (1978) (Where the sentencing court is silent as to whether multiple sentences run consecutively or concurrently, the judicially created "rule of lenity" will be employed to the effect that the sentences will be served concurrently). It has been suggested that "(t)he function of the consecutive sentence should be similar to the function of the sentence imposed on habitual or dangerous offenders," to protect the public from defendants who may pose an unusual risk to their safety. American Bar Association, Project on Minimum Standards for Criminal Justice Standards Relating to Sentencing Alternatives and Procedures § 3.4(c), Commentary at 177 (App. Draft 1968)
 
 
 [9]
 Thompson was originally sentenced to a term of eight years under 18 U.S.C. § 5010(c). Since that sentence did not exceed the sentence authorized by law for the offense, this case does not present the fact situation in which a longer confinement under a YCA sentence is upheld under the quid pro quo rationale. See note 2 supra. We do not here consider the effect of a subsequent YCA determination on a youth serving an indefinite sentence under 18 U.S.C. § 5010(b). It is that situation to which the constitutional questions referred to in Judge Adams' dissenting opinion are addressed. Nor can we accept the inference in the dissenting opinion that the absence of YCA segregation constitutes the substitution of "a different and more severe sentence for the prior sentence imposed by the youth offender's first trial judge." At 427. See Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); Montanye v. Haymes, 427 U.S. 237, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976)
 
 
 [1]
 Indeed, as the Tenth Circuit has expressly held, the imposition of a consecutive sentence for a separate and subsequent and entirely separate offense is entirely consistent with an earlier commitment under the YCA: "Neither is in statutory or constitutional conflict with the other." Nast v. United States, 415 F.2d 338, 340 (10th Cir. 1969); see Roddy v. United States, 509 F.2d 1145, 1147 (10th Cir. 1973)
 
 
 [2]
 The entire sentencing order of the second judge provided:
 The Court finds that the defendant was 20 years of age at the date of conviction, but will not derive benefit under 18 U.S.C. 5010(b) or (c) of the Federal Youth Corrections Act as a Youth Offender, accordingly,
 IT IS ADJUDGED that the defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for the period of his natural life, i. e., life imprisonment, and said sentence shall be and run consecutively to all other sentences the defendant is now serving.
 
 
 [3]
 As the majority recognizes, the interpretation of the YCA it adopts today is significantly different from that urged by the appellants in this case. They requested that we construe the Act "so as to permit the Bureau of Prisons to exercise its discretion regarding the institution and conditions of confinement best suited for prisoners serving YCA sentences who also have regular adult sentences yet to be served." The majority feels constrained to reject this argument specifically because "there is no language in the Act authorizing" such a practice and thus no statutory basis for it. But then, despite the similar absence of any language in the Act authorizing a judicial reevaluation of the continued benefit to a youth offender from YCA treatment, the majority establishes such a procedure on the ground that "it would not be inconsistent with the statutory scheme." Given the comprehensive nature of the statute in question, however, the absence of such a provision does not support, indeed it argues against, the exception to the Act fashioned by the majority
 
 
 [4]
 The Supreme Court also stated:
 "At present the United States is the only nation in the free world where one judge can determine conclusively, decisively and finally the minimum period of time a defendant must remain in prison, without being subject to any review of his determination." Symposium, Appellate Review of Sentences, 32 F.R.D. 257, 260-261 (Statement of Kaufman, J.) (1962).
 Professor Sanford H. Kadish also notes that in the United States, the "discretion of the judge . . . in (sentencing) matters is virtually free of substantive control or guidance," Kadish, Legal Norm and Discretion in the Police and Sentencing Processes, 75 Harv.L.Rev. 904, 916 (1962). We are unwilling to ascribe to the Congress an intent to import, sub silentio, sentencing doctrine contrary to traditional powers of sentencing judges.
 418 U.S. at 440 n. 14, 94 S.Ct. at 3051 n. 14.
 
 
 [5]
 That two sentencing judges, in the independent exercise of their discretion, reach divergent conclusions "does not invalidate either conclusion, for 'the (Youth Corrections) Act was intended to preserve the unfettered sentencing discretion of (sentencing) judges," Johnson v. United States, 391 A.2d 1383, 1384 (D.C.1978)
 
 
 [6]
 In N.L.R.B. v. The Catholic Bishops of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the Supreme Court expressly declined to construe congressional legislation in a manner that could in turn call upon the Court to resolve difficult and sensitive constitutional questions. As the Court declared: "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available," id. at 500, 99 S.Ct. at 1318. See The Charming Betsy, 2 Cranch (6 U.S.) 64, 118, 2 L.Ed. 208 (1804)