MICKLUS, Gregory Bernard, Appellant,

v.

CARLSON, Norman, Director, U. S. Bureau of Prisons; Fenton, Charles, Warden, U.S.P. Lewisburg, Pa.

No. 79–2234.

United States Court of Appeals, Third Circuit.

Argued March 18, 1980.

Decided Sept. 3, 1980.

William W. Warren, Jr. (argued), Dilworth, Paxson, Kalish, Levy & Kauffman, Scranton, Pa., for appellant.

Carlon M. O'Malley, Jr., U. S. Atty., Scranton, Pa., Frederick E. Martin (argued), Asst. U. S. Atty., Lewisburg, Pa., for appellees.

Before SEITZ, Chief Judge, and ROSENN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This appeal concerns, among other things, the existence *vel non* of causes of action for damages by a prisoner sentenced as a "young adult offender" under the Youth Corrections Act (YCA), 18 U.S.C. §§ 5005–5026, because of the government's failure to provide him with the treatment and segregation required by the YCA. The district court held that no private cause of action was implied in the YCA; that no cause of action for damages existed in the appellant's favor under the fifth, eighth or fourteenth amendments; that the claims for

injunctive and declaratory relief were mooted by the appellant's parole on the YCA sentence; and that the appellee, Carlson, was not personally served as required by Fed.R.Civ.P. 4(d)(1).

For the following reasons, we agree with the district court that no private cause of action can be implied in the YCA and that service on Carlson in his individual capacity was not properly accomplished under Fed.R.Civ.P. 4(d)(1). In contrast to the district court, however, we conclude that the appellant's requests for injunctive and declaratory relief are not moot and that a cause of action for damages exists directly under the fifth amendment.

## I.

■ The following statement of facts is taken from the pro se complaint filed in this case by the appellant, Gregory Micklus. Because this is an appeal from the grant of the appellees' motion to dismiss, the facts as pleaded in the complaint will be treated as true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n.2, 97 S.Ct. 2490, 2492 n.2, 53 L.Ed.2d 557 (1977).

On September 30, 1974, Micklus was sentenced by the U.S. District Court for the District of Arizona after pleading guilty to armed bank robbery, a violation of 18 U.S.C. § 2113(d). He was sentenced as a young adult offender to a thirteen to fifteen year term of imprisonment.[1] The trial judge could have sentenced Micklus as an adult offender to a maximum term of twenty-five years.

At the time of his sentencing, Micklus was twenty-five years old. He was designated to serve his term initially at the U. S. Penitentiary at McNeil Island, Washington, an adult facility, where it was recommended that he be placed in "close custody," and where he allegedly received no training or treatment. In February 1975, he was transferred to the U. S. Penitentiary at Leavenworth, Kansas, another adult facility, "for more effective custody." While there, he was charged with disciplinary infractions. He claimed these infractions occurred when he was defending himself against a homosexual attack by fellow prisoners in Leavenworth's carpentry shop.

In September 1975, he was transferred to the U.S. Penitentiary at Marion, Illinois where appellee, Charles Fenton, was the warden. Micklus remained in the adult population and allegedly was subjected to homosexual attacks by four prisoners in three separate incidents between July 15, and July 22, 1976. He claims that he attempted an escape from Marion as a result of these assaults and because of certain additional threats by other prisoners.[2] He

---

1. Non-adult offenders are subject to three sentencing schemes. Convicted persons under the age of eighteen, defined as "juveniles," 18 U.S.C. § 5031, are eligible for sentencing under the Juvenile Delinquency Act, 18 U.S.C. §§ 5031–5042. The Youth Corrections Act defines a youth offender as "a person under the age of twenty-two at the time of conviction." 18 U.S.C. § 5006(d). Convicted persons between the ages of twenty-two and twenty-six are termed "young adult offenders" and may be sentenced for treatment under the YCA if the sentencing court "finds that there are reasonable grounds to believe that the defendant will benefit from the treatment provided under the *Federal Youth Corrections Act*." 18 U.S.C. § 4216. Because Micklus was twenty-five at the time of his conviction and sentencing, he was sentenced as a young adult offender and was subject to the provisions of the YCA, specifically 18 U.S.C. § 5010(c). Under Section 5006(e) of the YCA, Micklus is a "committed youth offender" because he "is one committed for treatment . . . to the custody of the

Attorney General pursuant to Sections 5010(b) and 5010(c)." At the time of Micklus' sentence, Section 5010(c) provided:

(c) If the court shall find that the youth offender may not be able to derive maximum benefit from treatment by the Division prior to the expiration of six years from the date of conviction it may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter for any further period that may be authorized by law for the offense or offenses of which he stands convicted or until discharged by the Division as provided in section 5017(d) of this chapter.

This section was amended in 1976 by substituting "Commission" for "Division." Pub.L.No. 94–233, § 9, 90 Stat. 232 (1976).

2. In his complaint, he specifically alleged as follows:

On July 15, 1976, I was attacked and raped in my cell at Marion, Illinois by (3) three

was wounded by prison guards during his escape attempt. Following his conviction in the Eastern District of Illinois for attempted escape, he was sentenced to a regular five–year adult term to be served consecutively to his YCA sentence. As a result of the escape attempt and his conviction, Micklus was placed in administrative segregation, otherwise known as the "control unit."

On June 17, 1977, upon his release from the Marion control unit, he was transferred to the U.S. Penitentiary at Terre Haute, Indiana, where on June 23 he was charged with misconduct for refusing to enter the general population. His reasons were "fears of homosexual pressures and my being labeled as an informant while confined at Marion." As a result of this refusal to enter the general population, he was transferred to the U.S. Penitentiary at Lewisburg, Pennsylvania, on September 21, 1977. As at Terre Haute, Micklus refused to enter Lewisburg's general population in October and November 1977 and he was charged with misconduct for these refusals. Fenton was warden at Lewisburg while Micklus was confined there.

Lewisburg officials referred Micklus' case on November 11, 1977 for possible transfer to McNeil Island. On January 1, 1978, he was referred to the Federal Correctional Institution at Lompoc, California and was accepted. Because he filed a habeas corpus action not directly connected to the instant case, his movement from Lewisburg to Lompoc was temporarily prevented. On March 13, 1978, the U.S. District Court for the Middle District of Pennsylvania, in response to Micklus' habeas corpus petition, ordered him transferred to a facility where

he would be segregated from regular adult offenders and would receive treatment as required by 18 U.S.C. § 5011.[3] The court found that Micklus' incarceration at Lewisburg was in violation of Section 5011 of the YCA and that Lompoc did not qualify as an institution where he would receive the required segregation and treatment. The government's appeal was dismissed as moot because of Micklus' parole from his YCA sentence on September 1, 1978. *Micklus v. Carlson,* 591 F.2d 1336 (3d Cir. Jan. 31, 1979).

On July 6, 1978, the pro se complaint in this action was filed. The action was brought pursuant to the YCA and the first, fifth, eighth and fourteenth amendments, seeking both legal and equitable relief. Micklus named as defendants Carlson, Director of the U.S. Bureau of Prisons, and Fenton, Warden of the U.S. Penitentiary at Lewisburg. The complaint does not specify whether the plaintiff asserts his claims against the defendants in their official or individual capacities. Before the defendants responded to the complaint, Micklus was paroled from his YCA sentence. The defendants thereafter filed a motion to dismiss, or, in the alternative, for summary judgment.

On November 27, 1978, the Magistrate recommended that the complaint insofar as monetary damages were sought be dismissed as to Carlson, and that Micklus be given the opportunity to amend the complaint insofar as monetary damages were sought against Fenton in order to provide specifics of Fenton's affirmative involvement in the deprivation of Micklus' rights. Report of Magistrate (Nov. 27, 1978), *reprinted in* App., at 43a–51a. After objec-

---

convicts named: Norman Matthews, Raymond Beckley, and Jackie Martin.

On the night of July 21, 1976, I was again attacked by Raymond Beckley in my cell which was at knifepoint.

On the 22nd of July, 1976, I was assaulted in the yard by both Jackie Martin and William Newman and forced into an escape attempt which resulted in me being shot off the fence by a prison guard.

App., at 15a.

**3.** Section 5011 provides:

Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment. The Director shall from time to time designate, set aside, and adapt institutions and agencies under the control of the Department of Justice for treatment.

tions to this report were filed by both parties in the form of exceptions and motions, the district court remanded the case to the Magistrate. The Magistrate adhered to his initial recommendations and further recommended that the complaint be dismissed insofar as money damages were sought against Fenton. Report of Magistrate (Feb. 26, 1979), *reprinted in* App., at 54a–62a.

On April 23, 1979, the district court adopted the recommendations of the Magistrate and held that there was no implied private right of action for money damages for violations of the YCA's mandatory requirements of segregation of youth offenders and of treatment, nor was there a cause of action for violations of constitutional rights. The court also based its dismissal of the complaint for damages against Carlson on insufficient service of process because the U.S. Marshal did not serve Carlson personally in accordance with Fed.R.Civ.P. 4(d)(1). The district court further concluded that mootness prevented the complaint from stating a claim for injunctive relief because Micklus had been paroled from his YCA sentence after the complaint had been filed.

An appeal, filed with this court on April 30, 1979, was certified by the court below as frivolous on May 4, 1979. Micklus then filed motions seeking permission to proceed *in forma pauperis* before this court and for the appointment of counsel. These motions were granted on July 23, 1979. After the appeal was taken, Micklus was transferred from Lewisburg to Lompoc, California. Counsel for the plaintiff was appointed on September 6, 1979.[4]

## II.

■ Micklus sought the following equitable relief: a declaratory judgment that the defendants violated his constitutional rights; an injunction prohibiting his transfer to a facility not in compliance with the YCA; an injunction requiring the defendants to implement regulations that comply with the mandatory treatment and segregation provisions of the YCA; and such other equitable relief as the court deemed appropriate. In dismissing as moot Micklus' request for equitable relief, the district court only addressed one of these four requests for equitable relief, the injunction against a transfer to an institution not complying with the YCA. The district court believed this was moot because "since the Plaintiff at this time is serving and imprisoned for only one term, the five–year regular adult term imposed upon his conviction for attempted escape, he no longer has standing to seek declaratory or injunctive relief as a prisoner entitled to special consideration by virtue of 18 U.S.C. § 5011." *Micklus v. Carlson*, No. 78–640 (M.D.Pa. Apr. 23, 1979), at 2, *reprinted in* App. at 65a. We do not agree that the mere granting of parole on the YCA sentence renders Micklus' non–monetary claims moot.

Micklus has not been unconditionally released from his YCA sentence and is still subject to that sentence until 1989. Under Section 5020 of the YCA, a committed youth offender who has been conditionally discharged from YCA custody may be recommitted if the U.S. Parole Commission (Commission) determines that he would benefit from recommittal.[5] Micklus thus faces a realistic possibility of reincarceration under the YCA until 1989. His request for injunctive and declaratory relief is therefore not moot.

---

4. We are most appreciative of the diligence and excellence with which this matter has been pursued by William W. Warren, Jr., Esq., Micklus' court–appointed counsel.

5. Section 5020 provides:
 If at any time before the unconditional discharge of a committed youth offender, the Commission is of the opinion that such youth offender will be benefited by further treatment in an institution or other facility the Commission may direct his return to custody or if necessary may issue a warrant for the apprehension and return to custody of such youthful offender and cause such warrant to be executed by a United States probation officer, an appointed supervisory agent, a United States marshal, or any officer of a Federal penal or correctional institution. Upon return to custody, such youth offender shall be given a revocation hearing by the Commission.

The district court relied on *Preiser v. Newkirk*, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975), in holding this case moot. In *Preiser*, a prisoner was transferred to a maximum security prison from a medium security prison, without notice or an opportunity to be heard. The prisoner sought, via injunctive relief, return to the medium security prison. In light of the prisoner's return to the medium security facility, and subsequent transfer to a minimum security facility, the Supreme Court dismissed the action because it was moot. It reasoned that the prisoner had no reasonable expectation that the wrong of the complaint would be repeated and that to avoid mootness, the issue must bear out "a genuine claim of injury or possible injury of 'sufficient immediacy and reality' . . ." *Id.* at 403, 95 S.Ct. at 2335.

In contrast in this case, because of the low standard for reincarceration on the YCA sentence and because of the history of Micklus' confinement in noncomplying facilities, Micklus's request for an injunction against reincarceration on his YCA sentence in a noncomplying facility is a "genuine claim of . . . possible injury of sufficient immediacy and reality." While the Commission cannot be totally arbitrary, it may nevertheless revoke Micklus' parole status if "at any time . . . [it] is of the opinion that [he] will be benefited by further treatment in an institution or other facility." 18 U.S.C. § 5020. A real threat of reincarceration on the YCA sentence therefore exists and the issue is not moot.

In dismissing the prisoner's claims as moot, the district court also relied on *Lo-*

---

6. Because Micklus remains within the jurisdiction of the Bureau of Prisons, whether as an adult or as a YCA inmate, the district court could order the defendants at the least to provide a treatment program comparable to that he should have received before. It seems an entirely appropriate form of relief to order treatment even though he is presently serving an adult sentence.

7. The Supreme Court outlined the following test:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," . . . .–that is, does the statute create

---

*Cicero v. Day*, 518 F.2d 783 (6th Cir. 1975), where a prisoner challenged the factors that a parole board considered in denying him parole. Subsequent to the filing of the suit, the prisoner was granted parole and the district court dismissed the action as moot. Thus, the relief sought–parole–was granted. That obviously moots any controversy. But here, the relief sought–treatment, segregation and the issuance of regulations by the Bureau of Prisons that implement the YCA–has not already occurred. We are not unmindful of the appellees' strong arguments in favor of mootness. Nevertheless, on balance we find that the appellant has met his burden of establishing the need for injunctive relief and in repudiating the mootness rationale.[6]

### III.

We are also presented with the question whether the YCA gives rise to an implied cause of action in favor of a youth offender who allegedly received none of the YCA's benefits. We conclude that it does not. In *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), the Supreme Court established a four–part test to aid in determining the existence of a private cause of action.[7] The Court noted that "in situations in which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to create a private cause of action, although an explicit purpose to deny such a cause of action would be controlling." 422 U.S. at 82, 95 S.Ct. at 2090. The Court has since reemphasized that the *Cort v. Ash* test is basically one of statutory construction.

a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (citations omitted).

In *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979), the Court said that "what must ultimately be determined is whether Congress intended to create the private remedy asserted, as our recent decisions have made clear." In *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979), the Court stated that in *Cort v. Ash* "the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross* and *Transamerica* each emphasized that the *Cort v. Ash* factors were only the guideposts for discerning congressional intent. Moreover, the Court has cautioned:

> [T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person. Instead, before concluding that Congress intended to make a remedy available to a special class of litigants, a court must carefully analyze the four factors that *Cort* identifies as indicative of such an intent.

*Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979).

 The first question under *Cort* is whether the YCA was enacted for the benefit of a special class of which Micklus is a member. "That question is answered by looking to the language of the statute itself." *Id.* at 689, 99 S.Ct. at 1953. An examination of the language of the YCA and of the surrounding legislative history makes clear that Micklus is a special beneficiary of the YCA. The purpose of the YCA was "to provide a better method for treating young offenders convicted in federal courts in that vulnerable age bracket [between 16 and 22 years of age], to rehabilitate them and restore normal behavior patterns." *Dorszynski v. United States*, 418 U.S. 424, 433, 94 S.Ct. 3042, 3048, 41 L.Ed.2d 855 (1974), and to "make available for the discretionary use of the Federal judges a system for the sentencing and treatment of persons under the age of 22 years . . . that will promote the rehabilitation of those who . . . show promise of becoming useful citizens, and so will avoid the degenerative and needless transformation of many of these young persons into habitual criminals." H.R.Rep.No.2979, 81st Cong., 2d Sess. 1 (1950), *reprinted in* [1950] U.S. Code Cong. Service, p. 3983. Under the statute, a youth offender is defined as "a person under the age of twenty–two years at the time of conviction." 18 U.S.C. § 5006(d). However, a YCA sentence may be given to a defendant who is over twenty–two and not yet twenty–six years of age at the time of conviction, if the sentencing court affirmatively "finds that there are reasonable grounds to believe that the defendant will benefit from the treatment provided under the Federal Youth Corrections Act." 18 U.S.C. § 4216. There can be no question that Micklus, who was sentenced under the YCA, is clearly within "the class for whose *especial* benefit the statute was enacted." 422 U.S. at 78, 95 S.Ct. at 2088.

The second part of the *Cort* analysis calls for an examination of the legislative history of the Act. 422 U.S. at 82. We agree with both parties that the legislative history of the YCA is silent and does not deal at all with the ability of youth offenders to bring suit under the YCA. The appellant uses congressional silence to support his position–i. e., Congress' silence suggests that it did not intend to preclude private remedies. The Supreme Court has noted that "implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best." *Touche Ross & Co. v. Redington*, 442 U.S. at 571, 99 S.Ct. 2486. Yet, the Supreme Court has also suggested that congressional silence does not necessarily preclude finding a cause of action when the other elements of the *Cort* test are satisfied. *Cannon*, 441 U.S. at 694, 99 S.Ct. at 1956. The Court reasoned that "the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question." *Id.*

Yet, in *Cannon*, the Supreme Court noted that "[f]ar from evidencing any purpose to *deny* a private cause of action, the history of Title IX rather plainly indicates that Congress intended to create such a remedy." Moreover, in *Touche Ross* the Court summarized the cases where it found private causes of action, observing that "in those cases finding such private remedies, the statute in question at least prohibited certain conduct or created federal rights in favor of private parties." 442 U.S. at 569, 99 S.Ct. at 2485. From our reading of these cases, we cannot accept Micklus' argument that an intent to create a private cause of action can be discerned solely and exclusively from congressional silence. Thus, the second *Cort* factor is not satisfied.

The third *Cort* factor is whether a federal remedy is consistent with the overall structure of the Act. In *Cannon* the Court noted that

> when [a private right of action] remedy is necessary, or at least helpful to the accomplishment of the purpose, the Court is decidedly receptive to its implication under the statute.

441 U.S. at 703, 99 S.Ct. at 1961. There are several reasons why a finding of a private cause of action is not necessary or helpful to the accomplishment of the purpose of the YCA.

First, habeas corpus and mandamus relief are available to the youth offender aggrieved by noncompliance with the YCA's directives. Had Congress intended any other device to enforce the provisions of the statute, it could have done so. The statute is clearly drafted and benefited from an extensive ten year period of study and debate. Any legislative intent to include a private right of action would certainly have been included in such a thoroughly considered statute.

Second, with regard to actions for monetary damages, aggrieved youth offenders may proceed for certain claims under the Federal Tort Claims Act or may seek relief in a *Bivens* type action. Either action would accomplish many of the results sought by way of an implied statutory right of action.

The YCA sought to expand the sentencing options of federal judges to permit confinement of youth offenders in more rehabilitative environs. We cannot, as an adjudicatory body, say that a private cause of action would better accomplish this purpose. We therefore conclude that the third *Cort* factor is not met.

The final *Cort* factor is whether the matter is one that is traditionally relegated to state law. Because a federal sentencing statute is implicated here, no question of traditional state involvement is presented and no state cause of action exists to remedy the failure of the defendants to comply with the YCA. Thus, the fourth *Cort* factor has been met.

The creation of a private cause of action is, in the final analysis, one of legislative judgment and intent. Recently, Judge Rosenn, writing for this court in *Zeffiro v. First Pennsylvania Banking and Trust Co.*, 623 F.2d 290, 295 (3d Cir. 1980) explained:

> "The *Cort* test is an interpretative tool to determine if a cause of action has been in fact created, not an alternative rule to be applied when a cause of action is not expressly stated under the statute. In other words, the *Cort* test is a means of determining whether a statute intended to create a cause of action."

Therefore, while this case arguably fits nicely within two of the four *Cort v. Ash* variables, the core concept of *Cort v. Ash* and its progeny—congressional intent—remains unsatisfied. Accordingly, we hold that the YCA does not give rise to an implied private right of action.

IV.

We must next consider whether Micklus' pro se complaint states a cause of action for damages arising out of the constitution. The Supreme Court has implied a cause of action directly under the constitution and permitted the remedy of damages in two cases. *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (for violation of fifth amendment's due process clause and its equal protection

assurance); *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (for violation of fourth amendment rights). *See also, Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (*Bivens* remedy available directly under eighth amendment even though the allegations could support a Federal Tort Claims Act suit). We conclude that Micklus' complaint for damages for violations of his fifth amendment rights should not have been dismissed. Our reading of his complaint is in line with the principle that a prisoner's pro se complaint is held to a less stringent standard than formal pleadings drafted by lawyers. *United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 (3d Cir. 1979).

Micklus makes a fifth amendment claim that Section 5011 of the YCA creates a due process protectible property and liberty interest in treatment and segregation from the general prison population. His allegations suggest that the YCA, by mandating treatment and segregation, creates a property and liberty interest to which youth prisoners are entitled and that these cannot be denied without due process.

In *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the Supreme Court, speaking through Chief Justice Burger, articulated the methodology which we must use to determine whether claimed infringements involve a constitutional due process right. The Court stated:

> The Due Process Clause applies when government action deprives a person of liberty or property; accordingly, when there is a claimed denial of due process we have inquired into the nature of the individual's claimed interest.

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake. . . ." *Board of Regents v. Roth*, 408 U.S. 564, 570–571 [92 S.Ct. 2701, 2705, 33 L.Ed.2d 548] (1972).

This has meant that to obtain a *protectible right*

> "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a *legitimate claim of entitlement* to it." *Id.*, at 577 [92 S.Ct. at 2709].

*Id.* at 7, 99 S.Ct. at 2103 (emphasis added); *see also Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Thus, here we must determine whether Micklus has a "protectible right" or a "legitimate claim of entitlement" to some liberty or property interest which the appellees have allegedly violated. In order to ascertain whether there is such an entitlement protected by the constitution, we must study the schema of several interrelated corrections acts as they pertain to Micklus.

Though twenty–five years old at the time of sentencing, Micklus was sentenced as a "young adult offender", 18 U.S.C. § 4216.[8] The sentencing judge found that there were reasonable grounds to believe that Micklus would benefit from the treatment provided under the Youth Corrections Act and therefore, because of these special judicial findings, even though he was at least three years older than "youth offenders," 18 U.S.C. § 5006(d) ("a person under the age of twenty–two at the time of conviction"), Micklus, as a young adult offender, received the benefits and the burdens of the federal Youth Corrections Act by being sentenced

---

8. Section 4216 provides:

> In the case of a defendant who has attained his twenty--second birthday but has not attained his twenty–sixth birthday at the time of conviction, if, after taking into consideration the previous record of the defendant as to delinquency or criminal experience, his social background, capabilities, mental and

> physical health, and such other factors as may be considered pertinent, the court finds that there are reasonable grounds to believe that the defendant will benefit from the treatment provided under the Federal Youth Corrections Act (18 U.S.C., chap. 402) sentence may be imposed pursuant to the provisions of such Act.

pursuant to 18 U.S.C. § 5010(c).[9] Having thus been sentenced, he was a "committed youth offender" within the meaning of 18 U.S.C. § 5006(e). As a committed youth offender, he became entitled to the rights of treatment and segregation of a committed youth offender as declared in 18 U.S.C. § 5011. Section 5011 is not ambiguous.[10] In blunt terms it declares that "committed youth offenders" shall be sentenced to "institutions . . . and other agencies that will provide the essential varieties of *treatment.*" (emphasis added). It also provides that "[i]nsofar as practical, such institutions and agencies shall only be used for *treatment* of committed youth offenders, and such youth offenders shall be *segregated* from other offenders, and classes of committed youth offenders shall be *segregated* according to their needs for treatment." (emphasis added). The major thrust of Section 5011 is its requirement of both *segregation* and *treatment* for committed youth offenders.

■ Committed youth offenders sentenced under the YCA therefore must be segregated from adult prisoners. This is a mandatory obligation on the director of the Bureau of Prisons. *Thompson v. Carlson*, 624 F.2d 415, 420 (3d Cir. 1980); *United States ex rel. Dancy v. Arnold*, 572 F.2d 107, 113 (3d Cir. 1978). The statute also explicitly requires that the committed youth offenders receive treatment *"according to their needs."* Yet Micklus claims that he has not received treatment, and the appellees concede, that during his entire incarceration, which started in 1974, he has not been segregated with "classes of committed youth offenders."

■ *Does this statutory language which so explicitly mandates both segregation and treatment, create "a legitimate claim of entitlement" (Greenholtz) or a "liberty" (Wolff v. McDonnell) which becomes one of Micklus' fifth amendment due process rights?* This question is answered by comparing two Supreme Court cases involving prisoners asserting violation of due process rights, *Wolff v. McDonnell* and *Greenholtz*.

In *Wolff v. McDonnell*, prisoners claimed that the Nebraska administrative procedures and practices for "disciplinary proceedings did not comply with the Due Process Clause of the Fourteenth Amendment to the Federal Constitution." 418 U.S. at 543, 94 S.Ct. at 2968. The gravamen of the prisoner's complaint pertained to the procedures and the authority of the chief executive officer of the penal facility, in case of flagrant or serious misconduct, to order that a prisoner's reduction of term—good time credit—be forfeited or withheld and that the prisoner be confined in a disciplinary cell. While recognizing that "[l]awful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizens," the Supreme Court stated that though some "rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protection when he is imprisoned for crime. There is no iron curtain drawn between the constitution and the prisons of this country." *Id.* at 555–56, 94 S.Ct. at 2974. The Court declared that because the state created the right to "good time credit" and recognized that the denial of good time credit is a penalty for major misconduct, "the prisoner's interest in the disciplinary proceeding has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the Constitution and required by the due process clause to ensure that the state—created right is not arbitrarily abrogated." *Id.* at 557, 94 S.Ct. at 2975. The court concluded that "we think a person's *liberty is equally protected, even when the liberty itself is a statutory creation of the state.* The touchstone of due process is protection of the individual against arbitrary action of government." *Id.* at 558, 94 S.Ct. at 2976. (emphasis added). The Supreme Court required Nebraska to set up certain due process procedures before prisoners could sustain a loss

---

**9.** *See* n. 1 *supra.*

**10.** *See* n. 3 *supra.*

of "good time" or receive an imposition of confinement in a disciplinary cell.

In *Wolff*, the only *statutory* provision establishing procedures for the imposition of disciplinary sanctions required that an inmate be "consulted regarding the charges of misconduct" in connection with the forfeiture, withholding or restoration of credit for "good time." *Id.* at 548, 94 S.Ct. at 2970. Additionally there were written regulations dealing with procedures and policies for inmate misconduct. At the outset it should be noted that there are similarities between the Nebraska statute and the federal statute, Section 5011. Section 5011 as a federal statute can create a liberty interest just as the state statute did in *Wolff*. Each statute gives the prisoner a right. In Nebraska, it was *consultation* with the prisoner regarding the charges of misconduct; in the instant case the statute mandates segregation of committed youth offenders and treatment. Under any hierarchy of rights, the level of specificity and protection in Section 5011 is far greater in guaranteeing and assuring rights than the vague language in the Nebraska statute of merely assuring consultation. Is there anyone who would prefer the right to be merely "consulted" in lieu of the mandate that one has the actual right to treatment and to segregation from adult offenders? Certainly if in *Wolff* one had a liberty interest protectible under the due process clause because of the vague statutory right to consultation in the Nebraska statute, Micklus has a liberty interest embraced under the due process clause by reason of the far greater specificity in the definition of his rights in 18 U.S.C. § 5011.

In *Greenholtz*, the inmates claimed:

> that a reasonable entitlement is created whenever a state provides for the *possibility* of parole. Alternatively, they

claim that the language in Nebraska's statute, Neb.Rev.Stat. § 83–1,114(1) (1976), creates a legitimate expectation of parole, invoking due process protections.

442 U.S. at 9, 99 S.Ct. at 2104. The Supreme Court emphasized

> "That the state holds out the *possibility* of parole provides no more than a mere hope that the benefit will be obtained. . . . To that extent the general interest asserted here is no more substantial than the inmate's *hope* that he will not be transferred to another prison, a *hope* which is not protected by due process."

*Id.* at 11, 99 S.Ct. at 2105 (emphasis added). *See also Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). Unlike *Greenholtz*, the statute gives Micklus more than a mere "hope" that the director of federal prisons will segregate him from adults or will provide him with treatment; the director has no discretion to deny these rights. Thus, through Section 5011, Micklus has a legitimate expectation or a right. By the *Greenholtz* standard, Micklus' right constitutes a liberty interest worthy of fifth amendment due process protection.[11] The rights assured to Micklus under 18 U.S.C. § 5011 and the Federal Youth Corrections Act are not the product of a cavalier thought process. As Chief Justice Burger has said in *Dorszynski v. United States*, 418 U.S. at 432–33, 94 S.Ct. at 3047 (footnote omitted):

> The Federal Youth Corrections Act has been accurately described as the most comprehensive federal statute concerned with sentencing. *United States v. Coefield*, 155 U.S.App.D.C. 205, 209, 476 F.2d 1152, 1156 (1973). The Act is in substantial part an outgrowth of recommendations made by the Judicial Conference of

---

11. For an analysis of a "prisoner's potential liberty interest" *see Winsett v. McGinnes*, 617 F.2d 996, 1005 (3d Cir. 1980) (in banc) (Rosenn, J.). Certainly *Winsett* supports the result we reach here today. But it must be noted that Micklus has a far stronger case than Winsett because "the fundament of [Winsett's] claim is the set of *regulations promulgated by the department to implement the basic legislative*

grant of authority to create a work–release program," *Id.* at 1000 (emphasis added), while Micklus relies not on administrative regulations but instead on specific federal statutory rights. Though first amendment rights are not pressed in this case, for an analysis of first amendment rights where the defendants are federal employees, *see Paton v. LaPrade*, 524 F.2d 862, 869–872 (3d Cir. 1975) (Rosenn, J.).

the United States more than 30 years ago. The principles and procedures contained in the Conference recommendations were in turn largely based on those developed since 1894 for a system of treatment of young offenders in England, known as the Borstal system. See Criminal Justice Act of 1948, 11 & 12 Geo. 6, c. 58, and Criminal Justice Act of 1961, 9 & 10 Eliz. 2, c. 39. Statistics available at the time of the Conference study revealed the two principal motivating factors behind the enactment of the Act: first, the period of life between 16 and 22 years of age was found to be the time when special factors operated to produce habitual criminals. Second, then–existing methods of treating criminally inclined youths were found inadequate in avoiding recidivism. H.R.Rep.No.2979, 81st Cong., 2d Sess., 2–3 (1950) (hereinafter H.R.Rep.No.2979). The Act was thus designed to provide a better method for treating young offenders convicted in federal courts in that vulnerable age bracket, to rehabilitate them and restore normal behavior patterns.

■ Though Micklus does not have a private cause of action under 42 U.S.C. § 1983 because the defendants are federal officials, he does have "a cause of action and a damages remedy [which] can also be implied directly under the Constitution" because the "Due Process Clause of the Fifth Amendment is violated," *Davis v. Passman*, 442 U.S. 228, 230, 99 S.Ct. 2264, 2269, 60 L.Ed.2d 846 (1979), by reason of the liberty interest created in 18 U.S.C. § 5011. In *Davis v. Passman*, which involved alleged discrimination in the termination of employment of a female secretary, the Supreme Court held that "[t]he equal protection component of the Due Process Clause . . . confers on petitioner a federal constitutional right to be free from [certain types] of gender discrimination." *Id.* at 235, 99 S.Ct. at 2271 (footnote omitted). Micklus' rights as assured by Section 5011 are certainly at least as precise as those involving gender discrimination based on the fifth amendment due process rights.

We are not unmindful that some will complain about the drain on judicial resources when a federal court assures to a prisoner those rights specified by statute and guaranteed by the constitution. Such managerial and "case load" concerns were answered a decade ago by Justice Harlan and one hundred and seventy seven years ago by Chief Justice John Marshall. Concurring in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 411, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619 (1971), Justice Harlan wrote:

Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests. And current limitations upon the effective functioning of the courts arising from budgetary inadequacies should not be permitted to stand in the way of the recognition of otherwise sound constitutional principles.

■ In *Marbury v. Madison*, 5 U.S. 137, 163, 1 Cranch 137, 162, 2 L.Ed. 60 (1803), Chief Justice John Marshall wrote: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." Similarly, by reason of his fifth amendment rights, Micklus is entitled to both damage and injunctive relief if he proves a constitutional violation. Traditionally, "it is established practice for this Court to sustain the jurisdiction of the federal courts to issue injunctions to protect rights safeguarded by the Constitution and to restrain individual state [and federal] officers from doing what the 14th Amendment [and Fifth amendment] forbids the State [and federal government] to do." *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946) (footnotes omitted).

We are not here deciding the merits of Micklus' claim. We are merely deciding, on the basis of his pleadings, that he has a constitutional cause of action pursuant to

the fifth amendment. Similarly we need not reach the issue of or the scope of the appellees' good faith immunity defense. *See Winsett v. McGinnes*, 617 F.2d 996, 1008–1010 (3d Cir. 1980) (in banc).

### V.

The Magistrate concluded that the court did not have personal jurisdiction with respect to Micklus' claim for damages against Carlson individually because Carlson was not personally served as required by Fed.R.Civ.P. 4(d)(1).[12] Micklus concedes that the requirements of Rule 4(d)(1) were not met. Brief of Appellant at 26. He nevertheless argues that once Carlson was properly served in his official capacity, he was properly before the court in both individual and official capacities. We reject this argument.

The applicable method of service under Rule 4(d) depends upon the theory under which a party proceeds. Where money damages are sought from a public official in his individual capacity, service by certified mail under Rule 4(d)(5) is insufficient.[13] *Griffith v. Nixon*, 518 F.2d 1195,

1196 (2d Cir.), *cert. denied*, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975); *Relf v. Gasch*, 511 F.2d 804, 808 n. 18 (D.C.Cir. 1975). Instead, the plaintiff must proceed under the terms of Rule 4(d)(1) and effect personal service.

Moreover, as a result of recent guidance from the Supreme Court, the appellant's apparent suggestion that service by certified mail was sufficient under 28 U.S.C. § 1391(e) must also be rejected.[14] In *Stafford v. Briggs*, 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980), the Supreme Court held that the venue provisions of 28 U.S.C. § 1391(e) do not apply to actions for money damages brought against federal officials in their individual capacities. In so doing, the Court reasoned:

> Suits for money damages for which an individual officeholder may be found personally liable are quite different. If § 1391(e) were construed to govern actions for money damages against federal officers individually, suits could be brought against these federal officers while in government service—and could be pressed even after the official has left

12. Rule 4(d)(1) provides:
 (d) Summons: Personal Service. The summons and complaint shall be served together. The plaintiff shall furnish the person making service with such copies as are necessary. Service shall be made as follows:
 (1) Upon an individual other than an infant or an incompetent person, by delivering a copy of the summons and of the complaint to him personally or by leaving copies thereof at his dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

13. Rule 4(d)(5) provides: .
 (d) Summons: Personal Service. The summons and complaint shall be served together. The plaintiff shall furnish the person making service with such copies as are necessary. Service shall be made as follows:
 (5) Upon an officer or agency of the United States, by serving the United States and by delivering a copy of the summons and of the complaint to such officer or agency. If the agency is a corporation the copy shall be delivered as provided in paragraph (3) of this subdivision of this rule.

14. Section 1391(e) provides:
 (e) A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.
 The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought.

federal service—in any one of the 95 federal districts covering the 50 states and other areas within federal jurisdiction. This would place federal officers, solely by reason of their government service, in a very different posture in personal damage suits from that of all other persons, since under 28 U.S.C. § 1391(b), suits against private persons for money damages must be brought "in the judicial district where all the defendants reside, or in which the claim arose."

*Id.* at 784–85 (footnote omitted). We believe the Court's holding and explanation completely undermine Micklus' argument on this point. Accordingly, we agree with the Magistrate that service on defendant Carlson did not comply with Fed.R.Civ.P. 4(d)(1).

## VI.

Accordingly, we will reverse the district court's holdings that the appellant's claims for injunctive relief are moot and that no cause of action for damages arising from the fifth amendment existed in the appellant's favor. We will therefore remand the case for consideration of these claims. In all other respects, the judgment of the district court will be affirmed.

SEITZ, Chief Judge, dissenting in part.

I agree with the majority that the Youth Corrections Act (YCA) does not create an implied cause of action in favor of an offender sentenced pursuant to its terms but that appellant has a cause of action for damages under the due process clause of the fifth amendment for the violations of the YCA alleged in this case. I also agree that the district court did not obtain personal jurisdiction over appellee Carlson because of insufficient service of process. I part company with the majority in its conclusion that appellant's claims for declaratory and injunctive relief are not moot.

Although appellant has been granted parole on the YCA sentence and now is serving only an adult sentence, the majority concludes that his claims for declaratory and injunctive relief based on alleged violations of the YCA are not moot because he faces a realistic possibility of parole revocation and reincarceration under the YCA sentence. Even accepting the premise that the low standard for reincarceration incorporated in 18 U.S.C.A. § 5020 (West Supp. 1980) creates a "real threat" of appellant's future confinement under the YCA sentence, I nevertheless think that appellant's claims are moot unless there is a real and immediate possibility that such incarceration again will violate the YCA.

This court recently has emphasized that the YCA imposes on federal prison authorities a mandatory duty to segregate offenders sentenced under its terms from adult prisoners and to afford such offenders treatment according to their needs. *See Thompson v. Carlson*, 624 F.2d 415, 420 (3d Cir. 1980); *United States ex rel. Dancy v. Arnold*, 572 F.2d 107, 113–14 (3d Cir. 1978); 18 U.S.C. § 5011 (1976). Moreover, prior to the filing of the complaint in this case, the United States District Court for the Middle District of Pennsylvania concluded that appellant's confinement violated the YCA. It therefore granted appellant's petition for habeas corpus and ordered that he be transferred to a facility where he would receive treatment and be segregated from adult prisoners.[1]

Given these rulings, I do not think that the possibility that appellant again might be denied the treatment and segregation required by the YCA is sufficiently immediate and real to render this a live controversy. This possibility is further diminished by the fact that appellant may never be confined under the YCA again.

Nor is my conclusion undercut by appellees' prior placement of appellant in adult prisons. It was not clear that segregation of offenders sentenced under the YCA was mandatory under § 5011 until our 1978 decision in *Dancy*. Although appellant also re-

---

1. Although the government's appeal from this order was dismissed as moot by this court after plaintiff's parole, the district court's ruling has put defendants on notice of the YCA's requirements of treatment and segregation in this particular case.

mained in an adult prison for several months after *Dancy*, almost all of this confinement was pursuant to a stay pending appeal from the district court's grant of appellant's habeas corpus petition. Under these circumstances, I do not view appellees' prior conduct as in any way indicating that appellant will again be denied treatment and segregation if his parole is revoked and he is reincarcerated under the YCA. Accordingly, I would hold that appellant's claims for declaratory and injunctive relief are moot and would affirm the district court on this issue.